UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
MARQUISE D. WILLIAMS,

                               Plaintiff,

      - against -

OFFICER SALVUCCI #531 and SERGEANT
CIMORELLI,

                               Defendants.
--------------------------------------------------------------x

**OPINION & ORDER**

No. 20-CV-5098 (CS)

Appearance:

Kellie E. Lagitch
Chief Assistant County Attorney
Richard B. Golden
County Attorney for Orange County
Office of the Orange County Attorney
Goshen, New York
*Counsel for Defendants*

Seibel, J.

       Before the Court is Defendants' unopposed motion for summary judgment.  (ECF No.

42.)  For the reasons set forth below, Defendants' motion is GRANTED.

## I.    BACKGROUND

       The following facts are based on Defendants' Local Civil Rule 56.1 Statement, (ECF No.

48 ("Ds' 56.1 Stmt.")), and supporting materials, and are undisputed unless otherwise noted.[1]

---

[1] Plaintiff did not file a responsive Rule 56.1 Statement or any papers in opposition to this motion.  Local Civil Rule 56.1 requires that the party opposing a motion for summary judgment submit a counterstatement responding to the moving party's statement of material facts, indicating which facts are admitted and which the opposing party contends are in dispute and require trial.  L.R. 56.1(b).  Under the Local Rule, "[i]f the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) (citing L.R. 56.1(c)).  *Pro se* litigants

A.    <u>Facts</u>

Plaintiff brings this lawsuit in connection with an altercation that occurred on June 6, 2020, when he was a pretrial detainee at the Orange County Correctional Facility ("OCCF"). (Ds' 56.1 Stmt. ¶¶ 1-2, 5-29; IC at 3; AC at 4.)[2]  He alleges failure-to-protect claims against Defendants Correction Officer Anthony Salvucci and Sergeant Joseph Cimorelli.  (*See* AC at 4.)

On the date in question, Plaintiff was housed in OCCF's Delta 2, or "D2," housing unit in Cell 24 on the unit's top tier.  (ECF No. 44 ("Cimorelli Aff.") ¶¶ 4, 7.)  He had been transferred there the day before.  (*Id.* ¶ 3.)  Plaintiff alleges that that morning at approximately 8:30 a.m., he stopped Cimorelli near his cell and told him that he did not feel safe in the D2 unit because of the number of "no contact" or "keep separate" orders he had with regard to other inmates housed there, and requested to be moved.  (AC at 4.)  Cimorelli allegedly told Plaintiff that he could not be moved and "not to worry."  (*Id.*)  Cimorelli denies this, stating "had [this conversation] taken place I would have been required [to] lock him in his cell until his safety concerns could be evaluated and a determination made as to whether a move was warranted.  I would never have simply told him 'you will be all right' as he claims."  (Cimorelli Aff. ¶ 17.)

---

are not excused from this requirement.  *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 344 n.4 (S.D.N.Y. 2011).  As Defendants served Plaintiff with the requisite notice pursuant to Local Civil Rule 56.2, (*see* ECF No. 49), I have discretion to consider any properly supported facts in Defendants' Local Civil Rule 56.1 Statement admitted.  *Vance v. Venettozzi*, No. 18-CV-748, 2021 WL 4145705, at *3 (N.D.N.Y. Sept. 13, 2021).  (The Court will send Plaintiff copies of any unpublished decisions cited in this Opinion and Order.)  But granting Plaintiff special solicitude, I have considered his statements in his complaint and amended complaint, (ECF No. 2 ("IC"); ECF No. 16 ("AC")), and his deposition testimony, (ECF No. 43-9 ("P's Depo.")).  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.") (cleaned up).

[2] Citations to Plaintiff's IC; AC; and ECF Nos. 43-4, 43-5, 43-6, 43-7, 43-8, 43-11, 43-13, 43-14, and 43-15 refer to the page numbers generated by the Court's electronic filing system.

One of the "keep separate" orders had been issued on March 15, 2020, and required that Plaintiff and inmate Arnold Melendez, who had been involved in an altercation in the prison yard, were to have no contact with each other.  (Ds' 56.1 Stmt. ¶ 9; Cimorelli Aff. ¶ 5; IC at 3.) Melendez had been housed in the D2 unit since February 12, 2020.  (Ds' 56.1 Stmt. ¶ 10; Cimorelli Aff. ¶ 5.)

On June 6, 2020, non-defendant Officer Gregory Bosch was the Delta Control Officer ("DCO"), responsible for locking inmates in and out of their cells in the D1 and D2 housing units.  (Ds' 56.1 Stmt. ¶ 5; Cimorelli Aff. ¶ 7.)  The DCO sits in a separate room – often referred to as "the bubble" – located between the two housing units, and is the only officer who can electronically open the doors in both units.  (Ds' 56.1 Stmt. ¶ 6; Cimorelli Aff. ¶ 8.)  Salvucci was the Delta 2 housing officer, and Cimorelli was the Delta Wing sergeant.  (D's 56.1 Stmt. ¶¶ 7-8.)

At approximately 12:30 p.m. on June 6, 2020, according to Bosch, he verified with Defendant Salvucci that Plaintiff was due to be released from the unit for recreation, so he isolated the cells of the inmates with whom Plaintiff had "keep separate" orders and then "locked the unit out for recreation."  (ECF No. 43-4 at 2; *see* ECF No. 43-7 at 3.)  At about the same time, Melendez returned to the D2 housing unit, and Bosch unlocked the unit door to allow Melendez back in.  (Ds' 56.1 Stmt. ¶ 11; *see* ECF No. 43-7 at 3.)  Bosch "immediately realized [his] mistake," (ECF No. 43-4 at 2; ECF No. 43-7 at 3):  he had allowed Plaintiff out of his cell before Melendez had been locked in, (Ds' 56.1 Stmt. ¶ 13).  He then immediately alerted Salvucci by phone.  (*Id.*)

Meanwhile, Plaintiff exited his cell facing right, but then looked over the railing, saw Melendez on the lower tier of the housing unit, and turned to the left to go down the stairs.

3

(Video 1 at 0:13-0:29; ECF No. 43-4 at 2.)[3]  According to Plaintiff, as he walked down to the lower tier, "[w]e [saw] one another and again [e]ngae[d] in a fight."  (IC at 3; *see* AC at 4 ("we start fighting").)  Video of the incident, however, reveals that Melendez had started to go up the stairs, but when another inmate coming down blocked his way, he backed down the stairs and onto the lower tier.  (Video 1 at 0:17-0:26.)  Plaintiff continued down the stairs and punched Melendez, and Melendez began punching back at Plaintiff.  (*Id.* at 0:26-0:38; ECF No. 43-5 at 4.)

Salvucci made a radio transmission that there was a fight.  (Ds' 56.1 Stmt. ¶ 18; ECF No. 43-5 at 2; ECF No. 43-6 at 2.)  Shortly after, inmate Donnell Murray joined the fight and began attacking Plaintiff, (Video 1 at 0:38-0:56; ECF No. 43-5 at 4)[4]; Plaintiff "[went] down," (AC at 4; *see* Video 1 at 0:57; IC at 3); and Melendez stabbed Plaintiff "with something sharp in the face area," (IC at 3; *see* AC at 4).  Defendant Salvucci then sent a second radio transmission indicating that "the fight was now two inmates against one."  (ECF No. 43-5 at 4; *see* ECF No. 43-4 at 4; ECF No. 43-6 at 5.)  According to the video footage, Salvucci entered the camera's view after Plaintiff was on the ground, about thirty seconds after the altercation began, (Video 1 at 1:02), and first unlocked a cell to let an inmate near the fight into the cell, (*id.* at 1:04-1:09).  He appears to be about to do the same for another nearby inmate, moving toward the inmates who are fighting, and appears to remove something from his back pocket as he does so.  (*Id.* at 1:10-1:16).

---

[3] "Video 1" refers to video footage of the June 6, 2020 incident submitted to the Court by Defendants in support of their motion.  (*See* ECF No. 43 ¶ 20.)

[4] There was no "keep separate" order in place between Plaintiff and Murray.  (ECF No. 43-8 at 3; P's Depo. at 48:22-24.)

Defendant Salvucci reported that he gave the inmates several direct orders to stop fighting, which they ignored.  (ECF No. 43-5 at 4.)[5]  Sgt. Cimorelli entered the unit "less than a minute after the fight began" and states that he ordered the inmates to stop fighting.  (Cimorelli Aff. ¶ 15; Video 1 at 1:15-1:17.)[6]  Melendez and Murray complied and backed away from Plaintiff.  (Cimorelli Aff. ¶ 15; ECF No. 43-6 at 5; Video 1 at 1:18-1:21.)  Salvucci guided Melendez away and had his arm out to keep Melendez behind him.  (Video 1 at 1:18-1:35.)  Cimorelli "attempted to keep [Plaintiff] from advancing towards Inmate Murray and Inmate Melendez by using a body hold."  (ECF No. 43-6 at 5; Video 1 at 1:20-1:23.)  But Plaintiff broke free and advanced toward the two inmates, and the fight resumed.  (ECF No. 43-6 at 5; Video 1 at 1:23-1:36.)  While attempting to restrain Plaintiff, Cimorelli had dropped his can of oleoresin capsicum ("OC") spray.  (Video 1 at 1:25.)  He retrieved the can, (*id.* at 1:28-1:33), approached all three inmates, and told them they would be sprayed if they did not separate, (Cimorelli Aff. ¶ 16).  None of the inmates complied.  (*Id.*)  Cimorelli then deployed two one-second bursts of the OC spray to Plaintiff's and Murray's faces.  (*Id.*; Video 1 at 1:36-1:38.)  All three inmates then disengaged and separated.  (Video 1 at 1:39-1:42.)  Five additional officers, who were members of OCCF's emergency response team, then responded to the incident.  (*Id.* at 1:41-1:59.)

As a result of the fight, Plaintiff allegedly lost consciousness; suffered a concussion, swollen jaw, and "split/busted lip"; and had to be transported to an outside hospital.  (IC at 3-4;

---

[5] The video footage of the incident does not have any audio.

[6] The video shows Cimorelli entering about 44 seconds after the fight began.  (Video 1 at 1:15.)

AC at 5.)  He further alleges that the mouth area on the left side of his face had to be "glued"

back together because, he was told, inmates are not allowed to get stitches.  (IC at 3.)

On June 7, 2020, Plaintiff filed Grievance No. 20-0177 (the "Grievance") with Sgt.

Torres through the OCCF's inmate grievance program ("IGP"), (ECF No. 43-13 at 7), alleging

that Officer Salvucci and "[t]he officer working the (Bubble) at the time of the incident . . . failed

to follow protocol" because they failed to keep Plaintiff and Melendez separate per the "keep

separate" order, (ECF No. 43-14 at 12).  The Grievance was received the same day.  (Ds' 56.1

Stmt. ¶ 41.)  On June 12, 2022, the Grievance was accepted in part and denied in part by the

Grievance Coordinator, as follows:

> The Officer that opened your cell when your No Contact was not Secured will be
> handled administratively.  As for your Coming out of your cell when you
> knowingly engaged in an altercation with your No Contact . . . [,] you could have
> closed your cell door.  Your not closing your door Resulted in your injuries.

(ECF No. 43-14 at 12.)

On June 12, 2020, Sgt. DeEntremont delivered to Plaintiff copies of the decisions

rendered by the Grievance Coordinator, Sgt. Kiszka, for the Grievance and two others Plaintiff

had filed,[7] as well as copies of the New York State Commission on Correction ("NYSCC")

Inmate Grievance Form Part II ("Part II Form") for each of the grievances.  (ECF No. 46

---

[7] On June 6, 2020, Plaintiff filed two additional grievances – Grievance No. 20-178 and
Grievance No. 20-180 – with Sgts. Dellapia and Ehlers, respectively, (ECF No. 43-13 at 7-8),
which were also received the same day, (Ds' 56.1 Stmt. ¶ 46).  In Grievance No. 20-178,
Plaintiff alleges that a Correction Officer named "Longhlin" used a racial slur against him, (ECF
No. 43-14 at 15), and in Grievance No. 20-180, Plaintiff alleges that while at the hospital after
the altercation, an unnamed officer went into his cell and took a magazine and gave it to another
inmate, (ECF No. 43-14 at 9).  Both grievances were denied on the merits by the Grievance
Coordinator on June 12, 2020.  (ECF No. 43-14 at 9, 15.)

("DeEntremont Aff.") ¶ 4.)[8]  According to Sgt. DeEntremont, in his presence Plaintiff signed

each of the Part II Forms indicating that he accepted the decision of the Grievance Coordinator.

(*Id.* ¶ 5; *see* ECF No. 43-14 at 8, 11, 14; ECF No. 45 ("Kiszka Aff.") ¶¶ 19, 23.)  But Plaintiff

testified that he did not sign the Part II Form for the Grievance, and someone forged his signature

thereon.  (P's Depo. at 86:22-84:4; 84:23-85:8.)  Plaintiff stated that he was given a copy of the

Part II Form for the Grievance and recalls filling it out and saying he was appealing the decision.

(*Id.* at 85:12-18.)  He testified that someone delivered the Grievance decision and Part II Form to

him and he filled out the form with help from another inmate, putting an X next to "I am

appealing to the Chief Administrative Officer."  (*Id.* at 86:11-87:11.)  He testified that he gave

his Part II Form back to "the same officer that [he] gave the original grievance to."  (*Id.* at 85:21-

24.)  Plaintiff does not know who forged his signature on the Part II Form or why anyone would

have been motivated to do so.  (*Id.* at 97:15-18; 99:16-24.)  He also does not recall any other

instance where someone at OCCF forged his signature.  (*Id.* at 99:25-100:5.)

On June 17, 2020, Plaintiff told Sgt. Michael Schaffer that his signature had been forged

on his grievance appeal paperwork and requested a grievance form.  (ECF No. 43-14 at 3.)  Sgt.

Schaffer issued one, (*id.*), but Plaintiff never submitted it, (Kiszka Aff. ¶ 23).

### B.    Procedural History

Plaintiff filed his IC on July 2, 2020, bringing claims under 42 U.S.C. § 1983 for failure

to protect, in violation of the Fourteenth Amendment, against Salvucci, Cimorelli, Sheriff Carl

DuBois, Undersheriff Kenneth T Jones, and Orange County Jail Colonel Mele.  (IC at 1-5.)  On

July 7, 2020, the Court issued an Order of Service dismissing all claims against Dubois, Johnson

---

[8] Defendants' Rule 56.1 Statement states that this occurred on June 6, 2020, (Ds' 56.1 Stmt. ¶ 45), but the Inmate Grievance Form was signed on June 12, 2020 and Sgt. DeEntremont testified that that was the date as well.  (ECF No. 43-14 at 12; DeEntremont Aff. ¶ 4.)

and Mele, and ordering service on Salvucci and Cimorelli.  (ECF No. 6.)  The remaining

Defendants submitted a pre-motion letter in anticipation of their motion to dismiss on October 5,

2020.  (ECF No. 12.)  The Court held a pre-motion conference on October 30, 2020, at which it

granted Plaintiff leave to amend his complaint in response to the issues raised in Defendants'

letter.  (Minute Entry dated Oct. 30, 2020.)  Plaintiff submitted his Amended Complaint on

November 10, (AC), and Defendant's motion to dismiss followed on December 29, 2020, (ECF

Nos. 18-20).  Plaintiff never filed an opposition to the motion.  On July 7, 2021, the Court denied

the motion to dismiss.  (Minute Entry dated July 7, 2021.)

On July 21, 2021, Salvucci and Cimorelli answered the Amended Complaint.  (ECF No.

28.)  After discovery, they filed a pre-motion letter in anticipation of their motion for summary

judgment.  (ECF No. 38.)  On June 1, 2022, the Court held a pre-motion conference and set a

briefing schedule.  (Minute Entry dated June 1, 2022.)  On August 8, 2022, Cimorelli and

Salvucci filed the instant motion, (ECF Nos. 42-49), and Plaintiff once again failed to oppose.

## II.   **LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be

counted." *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." *Id.* at 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). If "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

9

*Pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).  Where, as here, the non-moving party fails to respond to the movant's summary judgment motion, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (cleaned up).  "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented."  *Id.* (cleaned up) (emphasis omitted).

## III.   DISCUSSION

### A.   Exhaustion Under the PLRA

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  The PLRA mandates that a plaintiff use "all steps that the agency holds out, and do[] so properly" – that is, in accordance with the applicable agency rules.  *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (cleaned up).  Exhaustion of available administrative remedies "must be complete prior to commencement of suit."  *Chalif v. Spitzer*, No. 05- CV-1355, 2008 WL 1848650, at *13 (N.D.N.Y. Apr. 23, 2008) (cleaned up).

"Because failure to exhaust is an affirmative defense, defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (cleaned up). "If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors . . . rendered a nominally available procedure unavailable as a matter of fact." *Id.* "[A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; is "so opaque that it becomes, practically speaking, incapable of use" or "so confusing that no reasonable prisoner can use" it; or "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Romano v. Ulrich*, 49 F.4th 148, 153 (2d Cir. 2022) (cleaned up).

For inmates at OCCF, administrative exhaustion requires compliance with the Inmate Handbook, which sets forth OCCF's Grievance Procedure. (ECF No. 43-11); *see Falls v. Campbell*, No. 17-CV-35, 2022 WL 1004179, at *6 (S.D.N.Y. March 30, 2022). The Inmate Handbook states that OCCF's "Grievance Coordinator will administer the grievance process," and act as liaison between the inmate, the Chief Administrative Officer, and the NYSCC. (Inmate Handbook at 33.) Paragraph 2 of the Grievance Procedure provides instructions for filing grievances:

> b. . . . [Y]ou may request and will receive a grievance form by the end of the shift, but no longer than eight (8) hours of your request
>
> c. Your grievance request must be submitted within five days of the incident.
>
> d. You may request and will receive assistance in filling out the form.

e.  The Chief Administrative Officer of his/her designee shall ensure that each grievance is investigated to the fullest extent necessary by an impartial person who was not personally involved in the circumstances giving rise to the grievance.  A grievance that is too vague to understand or fails to set forth supporting evidence or information will be returned to the inmate.  Failure to supply sufficient information or evidence within two (2) days shall be cause to deny the grievance.

f.  If you are not satisfied with the Grievance Coordinator's decision, you may appeal the determination to the Corrections Administrator within two business days of receiving the decision.

g.  You will receive a response within five (5) business days.

(*Id.* at 33-34.)  The Grievance Procedure further states that grievances can be placed in a

"Grievance Box", which is checked each business day in each housing unit.  (*Id.* at 34.)

Paragraph 4 outlines how an inmate can appeal to NYSCC:

a.  If the Corrections Administrator denies your grievance, you may appeal the decision within three business days to the State Commission on Corrections.  The facility is responsible for mailing the appeal to the Commission.  The Grievance Coordinator will issue a receipt indicating the date the appeal was submitted.

b.  You will receive a response from the Commission within forty-five business days of their receipt of the grievance.  The Chief Administrative Officer and the Grievance Coordinator will also receive a copy of the findings.  If it is found in favor of the grievant, as a matter of law, the Chief Administrative Officer will provide a remedy.

(*Id.*)

### B.  Whether Plaintiff Failed to Exhaust His Administrative Remedies

Defendants argue that Plaintiff failed to exhaust his administrative remedies prior to

filing the instant lawsuit.  (Ds' Mem. at 6-11).  Specifically, they argue that at a minimum,

Plaintiff failed to exhaust his claims against Defendant Cimorelli because the Grievance did not

name him, generally refer to him, or mention facts relevant to the claim against him.  (*Id.* at 10.)

They further claim that Plaintiff failed to appeal the initial decision by the Grievance

Coordinator.  (*Id.* at 8-9.)

It is clear Plaintiff was aware of the available Grievance Procedure:  he testified that he recalls receiving a copy of the Inmate Handbook, which included a description of the Grievance Procedure.  (P's Depo. at 78:15-23.)  He also testified that he was familiar with the process, (*id.* at 78:9-11), and indeed he made use of it frequently during his time at OCCF, including filing appeals, (Ds' 56.1 ¶¶ 36-40).

In Grievance No. 20-0177, Plaintiff wrote,

On 6-6-20, I was [l]ocked out [of] my cell for Recreation at 12:30 noon.  My (No Contact) [name redacted] wasn't suppose to be out nor in contact with me, we start fighting[,] another inmate jumps in and I start fighting both inmates.  I got stabbed in my mouth with something sharp and end up with a concussion and get[] transported to the Hospital to get my lip sealed back together.

(ECF No. 43-14 at 12.)  He further stated, "The officer working the (Bubble) at the time of the incident and Officer Salvucci #531, failed to follow protocol and to keep us separate.  If we w[ere] kept separate like we were supposed to[,] this altercation wouldn't have occurred and each officer should get written up."  (*Id.*)

"The officer working the (Bubble)" was not Defendant Cimorelli but was Officer Bosch. (Ds' 56.1 Stmt. ¶ 5.)  Plaintiff does not name or generally refer to Cimorelli in the Grievance. But "New York regulations relating to the filing of a grievance by a New York prison inmate do not require that an inmate identify every individual involved in the incident complained of in order to properly exhaust remedies as to those individuals."  *Snyder v. Whittier*, 2009 WL 691940, at *8 (N.D.N.Y. Mar. 12, 2009).  Although the Grievance Procedure says that "[a] grievance that is too vague to understand or fails to set forth supporting evidence or information will be returned to the inmate," (Inmate Handbook at 34), it contains no explicit requirement that the inmate list every responsible party.  Nor does the grievance form itself instruct the inmate to name those responsible for the alleged misconduct.  (*See, e.g.*, ECF No. 43-14 at 12); *see also Espinal v. Goord*, 558 F.3d 119, 126 (2d Cir. 2009) ("[T]he complaint form does not instruct the

inmate to name the officials allegedly responsible for misconduct."). Therefore, a *pro se* inmate "cannot be expected to infer the existence of an identification requirement in the absence of a procedural rule stating that the grievance must include the names of the responsible parties." *Espinal*, 558 F.3d at 127.

But Defendants are nevertheless correct that Plaintiff failed to exhaust his claim as to Defendant Cimorelli. This is because Plaintiff's failure-to-protect claim against Cimorelli is distinct from the claim against Salvucci and involves facts that were not outlined in the Grievance. Plaintiff does not allege that Cimorelli bears any responsibility for Plaintiff and Melendez being out of their cells at the same time. Rather, he alleges that he had a conversation with Cimorelli on the morning of June 6, 2020, in which Plaintiff said he did not feel safe in the D2 unit, but Cimorelli did nothing in response. (AC at 4.) Cimorelli's denial of this interaction, (Cimorelli Aff. ¶ 17), would create a fact issue, except the Grievance clearly did not detail or even refer to this alleged conversation, (*see* ECF No. 43-14 at 12).[9] The Grievance provided no notice that Plaintiff was alleging a claim of any kind against Cimorelli based on events hours before the fight. *See Percinthe v. Julien*, 2008 WL 4489777, at *2 (S.D.N.Y. Oct. 4, 2008) ("The question for this Court is whether the plaintiff's grievance sufficiently alerted prison officials that he was alleging some wrongdoing beyond that alleged against the person or persons specifically named in the grievance.") (cleaned up). Therefore, Plaintiff's claim as to Defendant Cimorelli was not properly exhausted.[10] *See Snyder*, 2009 WL 691940, at *8 ("[Plaintiff's]

---

[9] Plaintiff essentially concedes that he raised no grievance relating to the alleged inaction of Cimorelli. In the IC, in response to the question on the form, "Which claim(s) in this complaint did you grieve?" Plaintiff responded, "The officer that was there during the incident failed to keep me safe by letting my (no contact) out near me." (IC at 5.)

[10] Further, there are no circumstances that would have made the administrative process unavailable to Plaintiff – as is obvious from the fact that he filed a grievance against Salvucci and Bosch.

claim against Officer Funnye . . . is distinct from that against defendant Whittier, in that it asserts that Officer Funnye failed to report the incident after it happened to proper authorities.  Given this circumstance, [Plaintiff's] actions did not result in the proper exhaustion of his administrative remedies against defendant Funnye even if it is determined that he filed a proper grievance regarding the Whittier assault.").  As such, the remaining analysis will focus on whether Plaintiff has properly exhausted his administrative remedies as to his claim against Defendant Salvucci.

As outlined above, there is a dispute of fact as to whether Plaintiff signed the Part II Form accepting the Grievance Coordinator's decision, as Defendants contend, (DeEntremont Aff. ¶ 5; ECF No. 43-14 at 11; ECF No. 43-13 at 7), or if Plaintiff's signature on the Form is forged and Plaintiff actually sought to appeal, as Plaintiff contends, (P's Depo. at 86:11-87:11, 88:11-19), and as he reported to Sgt. Shaffer on June 17, 2020, (ECF No. 43-14 at 3).  Assuming, as I must, that Plaintiff did not submit the form to which Defendants point and instead submitted a form that indicated he wanted to appeal, the record is unclear as to whether that appeal was timely. An appeal must be filed within three business days, (*see* Inmate Handbook at 34), but Plaintiff provides no facts showing he filed the appeal within this time frame.

Nevertheless, giving Plaintiff the benefit of the doubt, and "[b]earing in mind that defendants bear the burden of proof on th[e] issue" of failure to exhaust, *Livingston v. Piskor*, 215 F.R.D. 84, 86 (W.D.N.Y. 2003), fact issues remain as to whether Plaintiff failed to exhaust his administrative remedies as to his claim against Defendant Salvucci,[11] so I turn to the merits.

---

[11] The same dispute presents a fact issue as to whether jail personnel prevented Plaintiff from filing a grievance through "machination, misrepresentation, or intimidation."

C.    <u>**Failure to Protect**</u>

Because Plaintiff was a pretrial detainee at the time of the altercation, I analyze his failure-to-protect claims under the Due Process Clause of the Fourteenth Amendment, rather than under the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

The Due Process Clause imposes on jail officials "a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (cleaned up). A prison official violates this requirement when (1) the inmate is incarcerated "under conditions posing a substantial risk of serious harm"; and (2) the prison official shows "deliberate indifference to inmate health or safety." *Id.* at 834 (cleaned up). "[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). "[M]ere negligence will not suffice." *Id.*; *accord Rembert v. Cheverko*, No. 12-CV-9196, 2014 WL 3384629, at *5 (S.D.N.Y. July 10, 2014).

A plaintiff may show that he is "incarcerated under conditions posing a substantial risk of serious harm," *Hayes*, 84 F.3d at 620, either from "a specific assailant or a more general risk of harm due to the conditions at the time of the attack," *Hurst v. Perez*, No. 15-CV-4703, 2017 WL 187532, at *2 (S.D.N.Y. Jan. 13, 2017), such as where "a substantial risk of inmate attacks was longstanding, pervasive, [or] well-documented," *Farmer*, 511 U.S. at 842. "Courts may find a substantial risk of serious harm where there is evidence of a previous altercation between a plaintiff and his attacker, coupled with a complaint by the plaintiff regarding the altercation or a request by the plaintiff to be separated from the attacker." *Mays v. Falu*, No. 18-CV-6145, 2019 WL 6619330, at *7 (S.D.N.Y. Dec. 5, 2019) (cleaned up).

16

"In the context of a failure to intervene claim, an officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." *Henry v. County of Nassau*, No. 13-CV-7427, 2015 WL 2337393, at *7 (E.D.N.Y. May 13, 2015) (cleaned up). "The law in this Circuit is clear that officers are under no obligation to put their own safety at risk by intervening in inmate fights." *Velez v. City of N.Y.*, No. 17-CV-9871, 2019 WL 3495642, at *5 (S.D.N.Y. Aug. 1, 2019). Where an inmate-on-inmate "fight was not of sufficient duration that an officer present as the scene would have had a reasonable opportunity to attempt to prevent the attack from continuing, the plaintiff cannot establish a Section 1983 failure to intervene claim." *Henry*, 2015 WL 2337393, at *7.

Defendants argue that because Plaintiff was clearly the aggressor, he cannot establish that he faced a substantial risk of serious harm. (Ds' Mem. at 11-13.) The Court agrees. "While courts will look to the existence of 'no contact' orders (or lack thereof) to determine whether a substantial risk of harm existed," *Garcia v. Westchester Cnty.*, No. 19-CV-2167, 2021 WL 706413, at *4 (S.D.N.Y. Feb. 22, 2021), "the existence of a no-contact order is not necessarily dispositive as to whether a substantial risk of serious harm exists," *Mays*, 2019 WL 6619330, at *8 n.7. Here, although there was a "no contact" order between Plaintiff and Melendez, the harm that led to Plaintiff's injuries was brought on by Plaintiff's initiation of the altercation. "[A]n inmate's own violent tendencies are not the type of 'substantial risk of serious harm' protected by the Constitution." *Louis-Charles v. Courtwright*, No. 11-CV-147, 2014 WL 457951, at *6 (N.D.N.Y. Feb. 4, 2014) (collecting cases). Therefore, "a prisoner who is himself the aggressor in fights with other inmates cannot succeed on a failure to protect claim." *Id.*; *see Huger v. Anderson*, No. 12-CV-1242, 2015 WL 1525994, at *4 (M.D.N.C. Apr. 2, 2015) (Plaintiff's act of

aggression against another inmate "represented a superseding cause" of Plaintiff's injuries, so officer's conduct was not proximate cause "as required to establish liability under § 1983").

Even if the existence of the "no contact" order were enough to demonstrate a risk of substantial harm to Plaintiff despite Plaintiff being the aggressor, he cannot establish that any official acted with the requisite deliberate indifference.  To succeed on the second prong of a failure-to-protect claim, "a pretrial detainee must prove that the defendant-official acted intentionally or recklessly failed to act with reasonable care to mitigate the risk of harm even though the defendant-official knew, or should have known, of the risk."  *Grant v. Hogue*, No. 17-CV-3609, 2019 WL 3066378, at *5-6 (S.D.N.Y. July 12, 2019) (cleaned up).  "Thus, unlike the Eighth Amendment, the Fourteenth Amendment can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm."  *Id.* (cleaned up).  "In general, a defendant must have known of a prior altercation between the individuals in question or of specific threats that had been made against the plaintiff," in order to be held liable for inmate-on-inmate violence.  *Garcia*, 2021 WL 706413, at *4.

Plaintiff alleges that on the day of the incident, he was let out of his cell "without knowing the where abouts" of Melendez, and Defendant Salvucci failed to inform him that Melendez was out of his cell and failed to keep him locked in until Melendez was returned to his cell.  (AC at 4; *see* IC at 5.)  He also alleges there was an "officer that stood there and did nothing at all to stop the two inmates from attacking him."  (IC at 4.)

First, Plaintiff does not provide any facts showing the Defendant Salvucci specifically was aware of the "no contact" order between Plaintiff and Melendez, or of any prior altercation or threats against Plaintiff.  But even if I were to assume such knowledge, Salvucci was not the

officer responsible for letting Melendez and Plaintiff out at the same time; that was Officer

Bosch, (Ds' 56.1 Stmt. ¶¶ 5, 11-13; Cimorelli Aff. ¶¶ 8-9), who is not named as a defendant.

Finally, Plaintiff's allegation that Salvucci "stood there and did nothing at all to stop the

two inmates from attacking [him]" mischaracterizes Salvucci's actions.  As soon as Plaintiff

initiated the fight, (Video 1 at 0:31), Salvucci radioed for help, and did so again moments later

when Murray joined in, (ECF No. 43-5 at 4).  Salvucci then segregated other nearby inmates,

(Video 1 at 1:02-1:15), before approaching the altercation and ordering those involved to stop

fighting, which Melendez and Murray did moments later when Cimorelli approached, (*id.* at

1:18-1:20; ECF No. 43-5 at 4).  Salvucci then attempted to isolate Melendez before Plaintiff

attacked again.  (Video 1 at 1:20-1:25.)  A reasonable jury would have to conclude that Salvucci

took reasonable measures to stop the fight.  *See Blaylock v. Borden*, 547 F. Supp. 2d 305, 312

(S.D.N.Y. 2008) (officer "took reasonable measures" to stop altercation when "[h]e immediately

ordered the men to cease fighting and promptly called for officer assistance. . . .  Considering

that [the officer's] actions – arriving promptly on the scene, calling for immediate assistance, and

ordering the men to place their hands on the wall – are in line with the officers' safety protocol,

plaintiff's contention that [the officer] acted with deliberate indifference fails as a matter of

law."), *aff'd* 363 F. App'x 786 (2d Cir. 2010) (summary order).  That he did not physically

intervene before the arrival of Cimonelli arrived does not show deliberate indifference.  *See*

*Rosario v. Nolan*, No. 16-CV-228, 2021 WL 2383769, at *3 (W.D.N.Y. Mar. 22, 2021) ("[I]t is

well established that a failure to intervene in an inmate-on-inmate assault is not actionable if, in

so doing, an officer would have subjected himself or others to harm."), *report and*

*recommendation adopted*, 2021 WL 2380818 (W.D.N.Y. June 10, 2021); *Velez-Shade v.*

*Population Mgmt.*, No. 18-CV-1784, 2019 WL 4674767, at *6 (D. Conn. Sept. 25, 2019)

(granting motion to dismiss where lone officer waited two minutes, until backup arrived, to intervene in an altercation involving three inmates); *Blaylock*, 547 F. Supp. 2d at 312 (reasonable for officer who was "was alone with two inmates, one of who[m] had a weapon" to call for backup "instead of jumping into the fight himself").

Therefore, Salvucci is entitled to summary judgment on Plaintiff's failure-to-protect claim.[12]

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 42), enter judgment for Defendants, and close the case

**SO ORDERED.**

Dated:  December 12, 2022
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[12] The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial.  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (citing 28 U.S.C. § 1367(c)(3)) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Having granted summary judgment on all claims over which this court has original jurisdiction, and having considered the factors set forth in *Cohill*, I decline to exercise supplemental jurisdiction over any state-law negligence claim Plaintiff may have intended to bring, and dismiss any such claim without prejudice.